**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| ROBERTA WATTS, mother and next of kin of Kalob Watts, deceased, <br><br> Plaintiff, <br><br> and <br><br> FRANKLIN WATTS, <br>     Intervenor Plaintiff, <br><br> v. <br><br> SCOTT LAHAY, <br><br> and <br><br> CITY OF BISMARCK, <br><br> Defendants. | Case No. 4:24-CV-01475-SPM |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Roberta Watts and Intervenor Plaintiff Franklin Watts bring this action against Bismarck Police Chief Scott LaHay and the City of Bismarck (the "City"), asserting excessive force claims under 42 U.S.C. § 1983 and wrongful death and survival claims under Missouri law related to LaHay's fatal shooting of their son, Kalob Watts. This matter is now before the Court on each defendant's motion for summary judgment (ECF Nos. 37 & 40), two motions to exclude expert opinions (ECF Nos. 43 & 45), and Defendants' motion to strike a memorandum filed by Plaintiff in opposition to summary judgment (ECF No. 60). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). ECF No. 21. For the following reasons, the Court will grant summary judgment in Defendants' favor on the Section 1983 claims, grant Defendants' motion to strike Plaintiff Roberta Watts's

1

memorandum, dismiss the state law claims without prejudice for lack of jurisdiction, and deny the motions to exclude testimony as moot.

## I.   FACTUAL BACKGROUND[1]

This case arises from the tragic death of 21-year-old Kalob Watts. Kalob lived with his mother, Plaintiff Roberta Watts. Kalob had been diagnosed at various times with conditions including severe depression, bipolar, obsessive defiant disorder, ADHD, sleep deprivation psychosis, and borderline personality disorder. On December 26, 2023, Kalob had been having a bad day and had been angry and ugly toward Plaintiff. Plaintiff texted a friend and asked her to call the police.

Officer Miranda West was dispatched to the Watts residence.[2] For about eight minutes, she was the only officer on the scene. Upon entering the residence, West encountered Plaintiff and Kalob in the kitchen. At the time West entered the residence and for the entirety of the incident, Plaintiff had Kalob in a bear hug, with Kalob's hands (one of which was holding a gun) pinned behind his back. Kalob's back was against a kitchen counter, and Plaintiff was standing facing him, holding on to Kalob's hands and the butt of the gun, which were behind Kalob's back. Plaintiff told West that Kalob had a gun. West took up a position at the doorway to the kitchen. At some point, West drew her gun. West ordered Kalob to drop his gun at least 36 times. West also

---

[1] Unless otherwise specified, these facts are taken from the parties' respective statements of fact and responses. *See* Defendants' Reply to Plaintiff's Response to Their Combined Statement of Uncontroverted Material Facts, ECF No. 58 (containing the text of Defendants' statement of facts, Plaintiff's responses, and Defendants' replies), ECF No. 50-2; Defendants' Response to Plaintiff's Additional Statement of Uncontroverted Material Facts, ECF No. 59 (containing the text of Plaintiff's statement of facts and Defendants' responses). The Court views the facts in the light most favorable to Plaintiff as the nonmovant.

[2] West's body camera was activated prior to entering the home and recorded for approximately three and a half minutes before the battery ceased functioning. Plaintiff also audio recorded the entire incident on her cell phone.

radioed dispatch, stating, "All units headed this way. There's a firearm and he's refusing to drop it." Kalob did not drop the gun.

LaHay heard West's radio dispatch concerning the subject with a gun and responded to the scene. He drew his firearm before entering the house. Kalob's first interaction with LaHay was calm, and Kalob invited to step over the baby gate in the kitchen doorway. LaHay kicked down the gate, entered the kitchen, and saw the gun. Kalob and Plaintiff were still in a bear hug up against the counter. LaHay was aware that West had been on the scene for approximately eight minutes before he arrived. LaHay directed West to holster her firearm and take out her Taser device.

LaHay was familiar with Kalob prior to the date of the shooting from LaHay's time as a resource officer at Kalob's school and from LaHay's time with the Bismarck police. He knew Kalob had mental health issues. In an incident two weeks prior to the shooting in this case, LaHay and another officer had responded to the Watts residence for a call involving Kalob threatening "suicide by cop." On that occasion, the officers were successful in convincing Kalob to voluntarily go to the hospital by ambulance for a psychiatric evaluation. Kalob complied without incident. Later the same day, a second incident involving Kalob and another officer occurred, but LaHay's knowledge of the incident was limited to a basic review of the incident report.

After LaHay arrived at the Watts residence, he, Kalob, and Plaintiff had the following exchange, captured by audio recording. LaHay was loud and aggressive during the exchange.

KALOB:      Hey, man. Come in. Go ahead and stop [sic] over the gate.

LAHAY:      Drop it or I'll shoot you right in the fucking face?

PLAINTIFF:  No, no, no.

LAHAY:      Drop it now.

KALOB:      Please do it, man. Please, man.

3

LAHAY:      If you pull that gun up, I'll drop you right now.

KALOB:      Please, pull the trigger. Go on, please. I'm trying, dog. Please let go. Just do it, man. Please man, please. Just do it dog. Please, dog, please.

LAHAY:      Get out of the way.

KALOB:      Please, dog. Please, dog.

LAHAY:      Roberta, get out of the way.

PLAINTIFF:  No.

KALOB:      Please, dog. Why are you all hesitating? Why are you hesitating? Let go. Just do it. Do it.

LAHAY:      Roberta, get out of the way.

KALOB:      Just do it. Please, dog.

LAHAY:      Roberta, get out of the way.

KALOB:      Please pop it. Please pop it. Please pop it.

PLAINTIFF:  Please, no. Please stop.

KALOB:      Please, I beg to God. I beg you, God.

PLAINTIFF:  Please stop.

KALOB:      Please kill me. Please kill me. Please kill me. Please kill me.

LAHAY:      Don't make me do this.

KALOB:      Please kill me.

LAHAY:      That is selfish to make me do this.

KALOB:      That's not selfish.

LAHAY:      Yes, it is.

KALOB:      Just kill me, dog.

LAHAY:      You should have done it yourself before you got us involved.

KALOB:      Please just shoot. I've got a knife.

[Gunshots.]

4

Approximately one minute and 15 seconds after entering the kitchen, LaHay fired two rounds, striking and killing Kalob.

Plaintiff described the moments leading up to the shooting as follows. Plaintiff's purpose in bear-hugging Kalob was to "keep [her] son from committing suicide by cop." Kalob was not fighting Plaintiff. Kalob could have easily moved Plaintiff out of the way and could have picked her up and thrown her aside if he decided to do so. With respect to the last few seconds before the shooting, Plaintiff testified as follows:

Q. But my question is; prior to LaHay actually firing his weapon, you were losing your grip on your son and you slid down to where your ear was no longer on his collar bone.

A. I slid down, but I didn't turn loose of that gun. I didn't turn loose of his arms. His arms were still behind him.

Q. Did you go to your knees?

A. No. I lost my footing.

Q. Okay. How far did you slide down your son's body?

A.  I don't remember.

Q. All right.

A. I know he lunged at him. He didn't do anything to him.

Q. And is it your testimony that the gun never moved from behind your son's back?

A. I imagine it did when I got jerked away from him. Then it was in my hand.

Q. Before Chief LaHay fired his weapon, is it your testimony that your son—that the weapon was in your son's hand, in your hand, behind his back and it never moved from there?

A. The gun was in my hand. My hand and my hand was on his wrist behind him.

Q. All right. And at any point prior to the shooting happening, did the gun—did you lose your grip in any way? Did the gun start to raise up?

5

A.     No.

Q.     So, it was always behind his back, that's your testimony?

A.     Yes.

West also reported that Kalob never pulled the gun out or directed it towards anyone.[3] In short, Plaintiff lost her footing and slid down Kalob's body, the gun remained behind Kalob's back (with Plaintiff's hand on it), Kalob lunged at LaHay, and LaHay shot Kalob.[4]

> The City's Use of Force Policy, states, *inter alia*:
>
> The use of Lethal force limited [sic] to the following situations:
>
> 1. to protect the officer or another from what he or she reasonably believes to be an imminent threat of death or serious physical injury;
>
> 2. to prevent the escape of a subject who is fleeing from an inherently violent crime, **AND** the officer has probable cause to believe that the subject poses a significant threat of death or serious physical injury to the officer or others.
>
> Whenever any of the two conditions described above are present, where feasible, officers shall identify themselves and provide a warning before the force is applied.

ECF No. 39-11, at 2-3. Officers were given digital copies of department policies, and a hard copy was available at the desk. LaHay Dep., Pl.'s Ex. 5, ECF No. 50-7, at 33:25-34:6. Officers had to complete training hours by a January 1st deadline, but LaHay testified that there were some

---

[3] LaHay's version of events is that Kalob "overpowered Roberta" and "brought the pistol perpendicular to his body and lunged forward attempting to aim the pistol to a shooting position." Offense/Incident Report, Pl.'s Ex. 4, ECF No. 50-6, at 2. He also testified that Plaintiff had fallen to her knees and that Kalob leaned forward and was bringing the gun up to align it to take a shot. LaHay Dep., Pl.'s Ex. 5, ECF No. 50-7, at 96:7-15; 123:2-8; 124:16-19. However, for purposes of this motion, LaHay acknowledges that the Court must accept Plaintiff's version of events, in which Kalob neither brought the gun perpendicular to his body nor attempted to aim the gun, in which Plaintiff did not fall to her knees, and in which the gun remained behind Plaintiff's back with her hand on it.

[4] In her response to Defendant's statement of facts, Plaintiff purports to deny that she testified that Kalob lunged at LaHay. For the reasons stated below in the Discussion section, the Court finds Plaintiff has not shown a genuine dispute of material fact on that point.

6

instances in which officers were noncompliant and allowed to work for two or three months past the deadline. *Id.* at 47:3-24. LaHay did not know whether there was a departmental order with a policy for disciplining officers. *Id.* at 42:11-15. LaHay did not necessarily approve discipline given to officers but would just be made aware of it. *Id.* at 42:16-19.

LaHay has 29 years of law enforcement experience. He has been a P.O.S.T. (Peace Officer Standards and Training Program) certified police officer with the Ste. Genevieve Sheriff's Department, the Potosi Police Department, the St. Francois County Sheriff's Department, and the Bismarck Police Department. He has served as the Chief of the Bismarck Police Department since August 2023. He has completed 600 hours of law enforcement academy training at Mineral Area College. He later returned to Mineral Area College and obtained his General Academy Instructor certification. Pursuant to P.O.S.T. certification requirements, LaHay has completed all required annual Continuing Law Enforcement Education training, presently 24 hours per year, including training in de-escalation and use of force. Beginning in 2017, Lahay has exceeded P.O.S.T.'s minimum requirements, having 53 hours (2017), 28 hours (2018), 68 hours (2019), 63 hours (2020), 67 hours (2021), 153 hours (2022), and 38 hours (2023).

Plaintiff asserts that LaHay testified that in 2010 and 2013, while working for other municipalities, LaHay had an excessive force lawsuit filed against him and had another complaint filed against him on an unspecified topic.[5] LaHay never spoke to the City of Bismarck about the prior complaints or lawsuits, and to his recollection, no one with the City ever asked him about them. Pl.'s Ex. 5, ECF No. 50-7, at 130:6-19. The record does not contain any additional

---

[5] Plaintiff cites LaHay's deposition for the assertions about these prior complaints but does not include the cited deposition page in her exhibits. *See* ECF No. 50-1, at p. 30 (citing page 128 of Ex. 5); Pl.'s Ex. 5, ECF No. 50-7 (including several pages of LaHay's deposition, but not including page 128).

information about the facts of these complaints or how they were resolved.

On November 4, 2024, Plaintiff filed a Complaint asserting three counts: (I) an excessive force claim against LaHay pursuant to 42 U.S.C. § 1983 and the Fourth Amendment; (II) a municipal liability claim against the City pursuant to § 1983, alleging that the City's unconstitutional policies, customs, and practices harmed Plaintiff and Kalob; and (III) wrongful death and survival claims against both defendants under Missouri law. On March 5, 2025, the Court granted a motion to intervene filed by Plaintiff's father, Franklin Watts. Each defendant now moves for summary judgment. Additionally, Plaintiff moves to exclude Defendants' expert, and Defendants move to exclude Plaintiff's expert. Defendants also move to strike a memorandum filed by Plaintiff in opposition to summary judgment.

## II.   LEGAL STANDARDS

The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). "A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Cameron v. City of Des Moines*, 168 F.4th 522, 527 (8th Cir. 2026) (quoting *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a

8

genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324).  "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010) (quoting *Godfrey v. Pulitzer Pub. Co.*, 276 F.3d 405, 412 (8th Cir. 2002)). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Hodge By & through Farrow v. Walgreen Co.,* 37 F.4th 461, 464 (8th Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).

The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013) (citing *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004)). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). (internal quotation marks omitted). "Summary judgment is appropriate if the movant is entitled to judgment as a matter of law even when all genuine factual disputes are resolved in the nonmovant's favor." *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 966 (8th Cir. 2021) (quoting *Bruning v. City of Omaha*, 6 F.4th 821, 824 (8th Cir. 2021)).

### III. DISCUSSION

Defendants move for summary judgment on all claims. The Court will address the claims in order.

### A.      Section 1983 Excessive Force Claim Against LaHay (Count I)

In Count I, Plaintiff alleges that LaHay subjected Kalob to excessive force, in violation of the Fourth Amendment, when LaHay shot and killed Kalob. LaHay argues that he is entitled to

summary judgment on Count I based on qualified immunity. A government official is "entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff[], demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Aldridge v. City of St. Louis*, 75 F.4th 895, 898 (8th Cir. 2023) (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). LaHay contends that Plaintiff has failed to establish either prong of the qualified immunity analysis.

### 1.   Whether LaHay Violated Plaintiff's Constitutional Rights

"The use of deadly force to restrain a person is a seizure under the Fourth Amendment." *Dimock v. City of Brooklyn Ctr.*, 124 F.4th 544, 552 (8th Cir. 2024) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). "[T]he use of deadly force is subject to the Fourth Amendment's reasonableness requirement," and "[t]hat requirement prohibits the use of excessive force in effectuating a seizure." *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020). "The test for whether force is 'excessive' asks 'whether the amount of force used was objectively reasonable under the particular circumstances.'" *Id.* (quoting *Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs*, 931 F.3d 672, 681 (8th Cir. 2019)). "What is objectively reasonable under the particular circumstances is evaluated from the perspective of a reasonable officer on the scene and turns on those facts known to the officer at the precise moment [he] effectuate[d] the seizure." *Id.* (internal quotation marks and citation omitted). The Court is "hesitant to second-guess the split-second judgments of officers working in tense, uncertain, and rapidly evolving situations." *Aipperspach v. McInerney*, 766 F.3d 803, 806 (8th Cir. 2014) (quotation marks omitted). "It may appear, in the calm aftermath, that an officer could have taken a different course,

10

but we do not hold the police to such a demanding standard." *Id.* (quoting *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (quotation marks omitted).

The use of deadly force is objectively reasonable "when there is 'probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others.'" *Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1086 (8th Cir. 2024) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). *Accord Maser v. City of Coralville,* 139 F.4th 1004, 1009 (8th Cir. 2025). "The only qualifier is that 'an officer should give some warning' when it is feasible to do so." *Morgan-Tyra*, 89 F.3d at 1086 (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012)) (internal quotation marks omitted). "Generally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury." *Hutchins*, 959 F.3d at 1132.  Rather, "[w]here [a] suspect possesses a firearm, deadly force is justified when the suspect 'points the firearm at another individual or takes a similar menacing action.'" *Maser*, 139 F.4th at 1009 (quoting *Hutchins*, 959 F.3d at1132 (8th Cir. 2020)). An officer "'may be justified in using a firearm before a subject actually points a weapon at the officer or others' when the officer reasonably believes 'there is an imminent threat of serious harm.'" *Id.* (quoting *Liggins v. Cohen*, 971 F.3d 798, 801 (8th Cir. 2020)). "Thus, in evaluating the reasonableness of an officer's use of deadly force, the court must consider the totality of the circumstances, including the location and danger of the weapon." *Id.*

Where an officer's claim that an individual pointed a gun at someone is the only asserted probable cause to believe that an individual posed a threat of serious injury or death, a genuine factual dispute regarding whether the individual pointed the gun will preclude summary judgment. *See Partridge v. City of Benton*, 70 F.4th 489, 492-93 (8th Cir. 2023) (summary judgment not appropriate where officers claimed they shot a suicidal individual after he pointed a gun at them

11

but the plaintiff's expert opined that, based on the autopsy, it was highly unlikely the decedent would have pointed the gun at them because it would have required a very abnormal movement; finding that "[a] jury could conclude, based on [the expert's] testimony, that [the individual] never pointed the gun at the officers but instead moved his gun in compliance with commands to drop his gun"); *Evans as Trustee for Evans v. Krook*, 680 F. Supp. 3d 1080, 1088-95 (D. Minn. 2023) (summary judgment not appropriate where an officer claimed he shot a suicidal individual because the gun the decedent was holding to his head was momentarily pointed in the direction of officers, through the decedent's head, when the decedent turned to look behind himself; finding there was a factual dispute about whether the movement caused the gun to be momentarily pointed at the defendant officer through the decedent's head and also finding that other pieces of evidence precluded the court from finding the decedent's movement was sufficiently "menacing," including that the decedent had made similar movements dozens of times during the 40-minute negotiation and had told the defendant officer he was "just making sure no one is behind him," that the decedent had repeatedly told the officers that he had no intention of harming them, that the decedent was still actively participating in negotiations and was midway through a sentence when he was shot, and that the standoff had lasted for nearly 40 minutes by the time the officer decided to shoot, weighing against a finding that the decedent posed an immediate threat).

On the other hand, even where an armed individual did not point a weapon at anyone (or where there is a factual dispute about whether that occurred), summary judgment may be appropriate where other undisputed facts provided probable cause for an officer to believe the individual posed a threat of serious injury or death. *See Maser*, 139 F.4th at 1009-10 (affirming summary judgment in favor of officer who shot a suicidal individual who made threatening comments, walked out of his garage holding a gun in his right hand, and raised his right arm in an

12

extended position away from his body at chest level; noting a factual dispute about whether the individual pointed the rifle at officers but stating, "[i]n this case, it is immaterial whether Maser actually pointed the rifle at a particular officer because a reasonable officer would perceive how Maser moved the rifle as threatening. In other words, Maser took a 'menacing action'"); *Cook*, 686 F.3d at 495-98 (affirming summary judgment in favor of officer who fatally shot an individual after responding to a domestic disturbance where the individual appeared intoxicated, was holding a knife in his right hand and appeared to be trying to conceal it, failed to comply with commands to drop the knife, stood up with the knife pointed downward and his arm at his side, and raised his right leg as if to take a step in the officer's direction while six to twelve feet away from the officer); *Liggins*, 971 F.3d at 800-01 (reversing district court's denial of officer's motion for summary judgment where the officer shot a suspect who, fleeing police, pulled a gun out of his bag and ran in the general direction of another officer who presented an obstacle to his escape, with the gun pointed down in the suspect's right hand and his hand moving as he ran; finding that the officer had "reasonable grounds to believe that the fleeing subject who was running toward the back of the property could raise the gun and shoot," that "[i]t would take only an instant to do so if the person were ready to fire," and that "[t]his was a split-second decision for the officer"); *Aipperspach*, 766 F.3d at 805-07 (affirming summary judgment in favor of officer who shot an individual holding a gun  at the bottom of a ravine where the individual kept the muzzle of the gun pointed at his own body or head for most of the encounter but refused multiple commands to drop his weapon, pointed the gun in the direction of an officer at one point, fell down a minute or two later, and, as he attempted to regain his balance after falling, waved the gun in the direction of the officers on the ridgeline above him); *Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 891-92 (D. Minn. 2022) (finding suspect took "menacing action" that justified deadly force when he came

13

to the front porch door unarmed, saw officers pointing their guns at him, went back inside, and emerged two minutes later with a rifle; stating that after the suspect "escalated the situation" by retrieving the rifle and coming out armed, the officers "were not required to wait until [the suspect] pointed his rifle before they fired their guns").

LaHay argues that he is entitled to summary judgment because even accepting as true Plaintiff's account of the incident (in which Kalob did not move or point the gun), LaHay's actions were objectively reasonable. Specifically, LaHay argues that it is undisputed that Kalob was holding a gun, that Plaintiff had Kalob in a bear hug with his hands pinned behind his back, and that in the seconds before the shooting, Plaintiff lost her footing and slid down Kalob's body and Kalob lunged at LaHay. LaHay argues that even if Kalob never pointed the gun at anyone, and even if the gun remained behind Kalob's back, Kalob took a "menacing action" and that there was thus probable cause for LaHay to believe Kalob posed an imminent threat of death or serious harm at the moment of the shooting.

In her opposition brief, Plaintiff does not argue that there is a genuine dispute about whether Kalob was holding a gun, whether Plaintiff had Kalob in a bear hug with his hands pinned behind his back, whether Plaintiff lost her footing and slid down, or whether Kalob lunged at Chief LaHay just before the shooting.[6] Instead, Plaintiff argues that summary judgment is inappropriate because

---

[6] After LaHay asserted in his statement of facts that Kalob lunged at LaHay, citing Plaintiff's testimony ("I know he lunged at him. He didn't do anything to him."), Plaintiff responded that she "[d]en[ies] any implication that Roberta was referring to Kalob lunging at Defendant LaHay, as Defendants asked no follow-up questions in the answer which is comprised of he/him pronouns, applicable to both Defendant and Kalob." ECF No. 50-1, at pp. 25-27. However, Plaintiff does not argue in her opposition brief that there is a genuine dispute of fact regarding whether Kalob lunged at LaHay.

To the extent that Plaintiff is attempting to establish a dispute issue of material fact on this point, she has failed to do so. A party asserting that a fact is genuinely disputed must support the assertion either by "showing that the materials cited do not establish the absence . . . of a genuine dispute" or by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).

here, as in *Partridge* and *Evans*, there are genuine disputes of material fact regarding whether Kalob ever pointed the gun at LaHay, ever began pointing the gun at LaHay, or ever moved his hand or the gun from behind his back. Plaintiff also argues that summary judgment is inappropriate because Defendant LaHay is not credible. She argues that LaHay has offered conflicting statements, and/or statements that conflict with West's statements or other evidence, regarding how tired Plaintiff was, whether Kalob could have overpowered her if he had tried to do so, whether Plaintiff had fallen to her knees at the time of the shooting, whether Plaintiff's hand was still on Kalob's wrist at the time of the shooting, whether and how Kalob raised his gun toward LaHay, whether Kalob threatened to shoot the gun, whether Kalob first addressed LaHay by yelling, whether LaHay warned Kalob that Kalob might shoot his mother, and how carefully LaHay reviewed information about a prior incident involving Kalob and another officer.

Plaintiff's arguments miss the mark because the factual disputes and credibility issues she identifies are not material to the instant motion. For purposes of the instant motion, LaHay does not ask the Court to find him credible or to accept his version of any disputed fact. Instead, he asks

---

Plaintiff has done neither. The only reasonable inference that can be made from the cited testimony is that Plaintiff was describing Kalob lunging at LaHay, not the other way around. The questions immediately preceding the statement, "I know he lunged at him" were about Kalob, not LaHay, indicating that the "he" refers to Kalob. The "he" in the next sentence—"He didn't do anything to him"—also clearly refers to Kalob, as the entire basis for Plaintiff's claim is that LaHay *did* do something to Kalob. Plaintiff has not submitted any evidence that what she saw was LaHay lunging at Kalob (for example, an affidavit attempting to clarify the meaning of her testimony), nor has she pointed to any other evidence that LaHay lunged at Kalob or moved in Kalob's direction just before the shooting. The only other evidence in the record addressing who lunged at whom indicates that Kalob lunged at LaHay, not the other way around. *See* Offense/Incident Report, Pl.'s Ex. 4, ECF No. 50-6, at p. 2 (in which LaHay stated that Kalob "lunged forward attempting to aim the pistol to a shooting position"); Missouri State Highway Patrol Report, Pl.'s Ex. 3, ECF No. 50-5, at 2 (describing West's statement that just before the shooting, she "believed Kalob was attempting to advance toward Chief LaHay but was being held back by Roberta"). In sum, all of the evidence in the record—from Plaintiff, LaHay, and West—shows that Kalob lunged at LaHay. There is no contrary evidence to show a genuine dispute.

15

the Court to disregard his version of the disputed facts and accept as true *Plaintiff's* version, including Plaintiff's testimony about what occurred in the key moments before the shooting. When the Court resolves all possible genuine disputes in favor of Plaintiff and ignores the statements of LaHay that Plaintiff argues are not credible, the facts are as follows. LaHay knew that Kalob had mental health issues and knew that Kalob had suicidal ideations as recently as two weeks earlier. LaHay knew that Officer West had been on the scene for approximately eight minutes before he arrived. LaHay drew his firearm before entering the residence. Kalob was in the kitchen holding a gun, with his mother holding him in a bear hug and pinning his hands and the gun behind his back. Kalob's first interaction with LaHay was calm, and Kalob invited LaHay to step over the baby gate in the kitchen doorway. LaHay kicked down the gate, entered the kitchen, and loudly and aggressively told Kalob, "Drop it or I'll shoot you right in the fucking face." LaHay also told Kalob, "If you pull that gun up, I'll drop you right now." Kalob refused multiple commands to drop the gun and repeatedly asked LaHay to kill him. Kalob never threatened to shoot LaHay. Kalob's mother eventually lost her footing and slid down (but did not fall to her knees), Kalob lunged at LaHay, and LaHay shot Kalob. Throughout the encounter, Kalob's hands and the gun remained behind his back, held by Plaintiff; Kalob never pointed the gun at LaHay and never moved the gun or his arm in the direction of LaHay. The shooting occurred about one minute and fifteen seconds after LaHay arrived at the scene.

Plaintiff does not dispute any of the above facts, nor does she describe any alternative version of the facts that is more favorable to her. Based on this Plaintiff-friendly view of the facts, the Court finds LaHay's use of deadly force against Kalob was objectively reasonable and thus did not violate the Fourth Amendment. Given the tense, uncertain, and rapidly evolving circumstances, the close proximity of the parties, and Kalob's repeated refusal to drop the gun, Kalob's lunging

16

at LaHay as his mother lost her footing and started to slide down his body was a "menacing action" that created probable cause that Kalob posed an immediate threat of death or serious injury to LaHay—even if Kalob never moved the gun itself. At the moment Kalob lunged in LaHay's direction, especially with Plaintiff having just lost her footing, it was objectively reasonable for LaHay to believe that Kalob had begun to act aggressively toward LaHay and that in a matter of seconds, Kalob could have moved the gun from where Plaintiff had been holding it behind his back and could have shot at LaHay. *See Liggins*, 971 F.3d at 801 (considering that "[i]t would take only an instant" for a suspect to fire at an officer if he were ready to do so); *Cook*, 686 F.3d at 495 (use of deadly force reasonable against individual who refused commands to drop a knife, held the knife pointed downward, and raised his right leg as if to take a step in the officer's direction while six to twelve feet away from the officer). After Kalob escalated the situation by lunging at LaHay, LaHay was not required to wait until Kalob actually pointed the gun at him before firing. *See Yang*, 607 F. Supp. 3d at 891-92 (noting that a suspect "escalated the situation" by retrieving a rifle and that the officers "were not required to wait until [the suspect] pointed his rifle before they fired their guns").[7]

Plaintiff argues that the fact that LaHay knew that Kalob was suicidal and was not suspected of a crime suggests that Kalob did not pose a threat. The Court agrees that these facts would generally weigh against a finding that an individual posed a threat to others. Additionally,

---

[7] Neither party addresses the question of whether LaHay provided adequate warning to Kalob or whether a warning was unnecessary because it was not feasible under the circumstances. Based on the transcript of the audio recording of the incident, the Court finds that LaHay gave adequate warning when he told Kalob "Drop it or I'll shoot you right in the fucking face" and "If you pull that gun up, I'll drop you right now." The Court also finds that it was not feasible for LaHay to give an additional warning after Kalob lunged because at that point the threat was imminent. *See Liggins*, 971 F.3d at 801 ("When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible.").

the Court recognizes that "[i]t is not objectively reasonable for a police officer to shoot someone who is only threatening self-harm." *Evans*, 680 F. Supp. 3d at 1094. However, as *Maser* makes clear, even in a case involving a suicidal individual, probable cause to believe the individual poses a threat of death or serious bodily injury to others may exist if the individual takes an action that would be perceived by a reasonable officer as threatening. *See* 139 F.4th at 1009; *see also Rogers v. King*, 885 F.3d 1118, 1121-22 (8th Cir. 2018) (holding summary judgment in favor of officers was warranted because officers responding to a call about a suicidal individual with a gun had probable cause to believe she posed a threat of serious physical harm where they found themselves in the hallway with her, she failed to respond to commands to drop the gun, and she raised the gun to the level of one of the officers' shins). Here, Kalob's act of lunging at LaHay (while holding a gun) would have appeared to be an act of aggression that would have indicated to a reasonable officer that Kalob did not pose a threat only to himself but also posed a threat to LaHay.

*Partridge* and *Evans*, relied on by Plaintiff, are distinguishable. In each of those cases, the officers' disputed assertion that the individual had pointed a gun in their direction was the only asserted basis for finding probable cause that the individual posed a threat of serious injury or death. Thus, when the courts in those cases resolved the dispute over whether the gun had been pointed at the officers in the plaintiffs' favor for purposes of summary judgment, there was no other probable cause remaining to demonstrate that individuals posed a threat of serious injury or death.[8] Here, in contrast, even if the Court resolves the dispute over the pointing of the gun in Plaintiff's favor, there is a separate and *undisputed* basis for finding such probable cause: Kalob's

---

[8] *Evans* is also distinguishable because that case involved additional facts suggesting that the decedent's movement was not "menacing," including that he had made similar movements dozens of times over a period of 40 minutes, had given a verbal explanation of an innocent reason for the movement, and had repeatedly told officers that he had no intention of harming them.

lunging at LaHay as the person holding Kalob's arms and gun behind his back was losing her footing.

In sum, even when all factual disputes are resolved in Plaintiff's favor, the Court finds LaHay did not violate Plaintiff's constitutional rights. Thus, LaHay is entitled to summary judgment based on the first prong of the qualified immunity analysis.

### 2.  Whether the Constitutional Right at Issue Was Clearly Established

In the alternative, even assuming, *arguendo*, that LaHay's use of force was objectively unreasonable, the Court finds that LaHay is entitled to qualified immunity under the second prong of the analysis because his conduct did not violate a clearly established constitutional right.

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotation marks omitted). For a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply

19

to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12, (2015) (per curiam)).

Even if LaHay's actions violated the Fourth Amendment, the Court cannot say that "existing precedent . . . placed the statutory or constitutional question beyond debate." *See al-Kidd*, 563 U.S. at 741. Plaintiff has not cited, and the Court has not found, any cases presenting facts similar to those here in which a court has found a Fourth Amendment violation, either before or after the incident occurred. As discussed above, the cases on which Plaintiff relies—*Partridge* and *Evans*—are distinguishable from this case. They would not have put a reasonable official on notice that it would violate the constitution to use deadly force against an armed suicidal individual who, at close quarters and holding a gun, after ignoring commands to drop the gun, lunges in the direction of an officer. On the other hand, cases such as *Aipperspach*, *Cook*, and *Rogers* would have indicated to a reasonable officer in LaHay's position in 2023 that the use of force in this case would have been constitutional.

*Swearingen v. Judd*, 930 F.3d 983 (8th Cir. 2019), is also instructive. In *Swearingen*, an individual suspected of slashing tires with a knife was inside a home with officers. *Id.* at 986, 988. He ignored multiple commands to drop the knife and went inside a closet. *Id.* The defendant officer opened the closet door, and the suspect was standing behind the door with a knife. *Id.* The officer quickly stepped back and fired three shots at the suspect, with the two individuals being about two to three feet apart when the officer fired. *Id.* For purposes of summary judgment, the court assumed that the suspect "was neither advancing toward [the defendant] nor holding the knife with the blade directed at the officer." *Id.* at 988. The Eighth Circuit declined to address whether the officer's use of force was objectively reasonable, finding instead that the officer did not violate a clearly established right. *Id.* The court emphasized that the officer was suddenly confronted, that the

20

suspect was only three feet away from the defendant, that the suspect "was armed with a knife after ignoring multiple commands to drop it," that the suspect "had been noncompliant and could have caused serious injury or death in a matter of seconds by repositioning himself and the knife" and that the situation was "tense and rapidly evolving." *Id.* It found "the officer's actions s[at] along the 'hazy border between excessive and acceptable force,'" and thus qualified immunity applied. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

As in *Swearingen*, the situation here was tense, rapidly evolving, and involved a suspect who was armed (but not pointing a weapon toward an officer), refusing to drop his weapon, and in close proximity to an officer. As in *Swearingen*, Kalob could have caused serious injury or death in a matter of seconds by repositioning himself or his weapon. Indeed, the facts of the instant case suggested a significantly higher level of threat than the facts in *Swearingen*, because Kalob had a gun rather than just a knife and because Kalob did make a movement in the direction of the officer. As in *Swearingen*, at most, LaHay's actions "sat along the hazy border between excessive and acceptable force," and LaHay is entitled to qualified immunity based on the second prong of the analysis.

For all of the above reasons, the Court will grant LaHay's motion for summary judgment on Count I.

### B.      Section 1983 Excessive Force Claim Against the City (Count II)

In Count II, Plaintiff alleges that the City had policies and customs that were the moving force behind Kalob's death. Specifically, Plaintiff alleges that the City failed to properly train its law enforcement officers in the use of excessive force, deadly force, and medical aid; that the City expressly and/or tacitly encouraged excessive force; that the City ratified police misconduct; that the City failed to conduct adequate unbiased investigations of police misconduct; and that the City

21

failed to properly train LaHay in matters including the reasonable and appropriate use of force. In the instant motion, the City argues that it is entitled to summary judgment because Plaintiff cannot prove any underlying constitutional violation, because Plaintiff cannot prove the City had any unconstitutional policy or custom, and because Plaintiff cannot prove that any such policy or custom caused the constitutional violation.

It is well established that "in order for municipal liability to attach, individual liability first must be found on the underlying substantive claim." *Moore v. City of Desloge,* 647 F.3d 841, 849 (8th Cir. 2011) (quoting *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005)). *Accord, e.g., Saunders v. Thies*, 38 F. 4th 701, 716 (8th Cir. 2022). For the reasons stated above, LaHay did not violate Kalob's constitutional rights. Thus, Plaintiff's municipal liability claim necessarily fails, and the City is entitled to summary judgment on Count II. *See, e.g., Moore*, 647 F.3d at 849 (affirming summary judgment on claim of municipal liability because the plaintiff failed to establish an underlying constitutional violation).

In the alternative, even assuming, *arguendo*, that Plaintiff could show that LaHay violated Kalob's constitutional rights, the City would be entitled to summary judgment because Plaintiff has not cited sufficient evidence to support a finding in her favor on the other required elements of a municipal liability claim. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, "[s]ection 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016)).

22

Plaintiff has not presented any evidence to support a claim that an official City policy caused LaHay to use excessive force against Kalob. The only official policy in the record—the written use of force policy submitted by the City—appears to be consistent with the Fourth Amendment law set forth above. Plaintiff does not argue otherwise, nor does she identify any other official policy that could support a municipal liability claim.

Plaintiff also has not presented sufficient evidence to support a claim that the City had an unofficial custom that caused LaHay to use excessive force against Kalob. To establish municipal liability through an unofficial custom, Plaintiff must demonstrate "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Corwin*, 829 F.3d at 700 (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)).

Here, at most, Plaintiff has cited evidence that two excessive force complaints were made against LaHay prior to his employment with the City. There is no evidence about the facts of these complaints, whether they involved conduct similar to the conduct in this case, or whether they were ever found to have any merit. There is no evidence that the City was even aware of these complaints. There is no evidence of uses of excessive force by any other City officer, nor is there evidence the City ever failed to investigate uses of excessive force. The existence of two complaints in one officer's 29-year law enforcement history, both occurring prior to the officer's employment with the City, without any evidence of the merit or specific content of the complaints, and without any evidence that the City was even aware of them, is not sufficient to support a

23

finding that there was a widespread, persistent pattern of unconstitutional misconduct by City employees or a finding that the City was deliberately indifferent to or tacitly authorized that misconduct.[9] *See Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) ("[I]n the face of an express municipal policy prohibiting excessive force, two incidents of excessive force—even assumed to be true—cannot be considered a pattern of widespread and pervasive unconstitutional conduct"); *Mettler v. Whitledge*, 165 F.3d 1197, 1204-05 (8th Cir. 1999) (noting that "the mere existence of previous citizens' complaints does not suffice to show a municipal custom of permitting or encouraging excessive force" and affirming summary judgment in favor of a county where the plaintiff had evidence of nine total prior complaints of excessive force against two officers, only one of which was sustained, and the plaintiff had "not shown that the incidents giving rise to those complaints bear any factual similarity" to the case at bar); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (affirming summary judgment in favor of a city; finding two complaints of misconduct by an officer did "not indicate a 'persistent and widespread' pattern of misconduct that amounts to a city custom or policy of overlooking police misconduct"); *Mick*, 883 F.3d at 1080 (affirming summary judgment in favor of municipality on custom claim because "the affidavits of three detainees describing alleged constitutional violations are not sufficient to

---

[9] To the extent that Plaintiff suggests that the City cannot rely on the *absence* of evidence about past incidents because information regarding those incidents was equally available to Defendants, *see* Pl.'s Mem. ECF No. 51, at 4-5, that argument is without merit. Plaintiff bears the burden of showing a pattern of misconduct to support her municipal liability claim. *See, e.g., Mick*, 883 F.3d at 1080. Where the nonmoving party bears the burden of proof, the party moving for summary judgment is "free to rely on the *absence* of evidence supporting the plaintiff's claims." *Washington v. City of St. Louis,* 84 F.4th 770, 773 (8th Cir. 2023) (quoting *Celotex*, 477 U.S. at 425). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Hodge*, 37 F.4th at 464 (quoting *Celotex*, 477 U.S. at 322-23). Discovery in this case is complete. If Plaintiff still cannot point to evidence sufficient to support an element of her claim, summary judgment is appropriate.

establish a genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, known to and unaddressed by policymaking officials"). The record does not contain evidence sufficient to support a finding that the City had a custom of using excessive force, a custom of failing to investigate uses of excessive force, or any other unconstitutional custom.

Plaintiff also has not presented sufficient evidence to support a claim based on the City's failure to train or supervise. To support a claim of municipal liability under a failure to train theory, the plaintiff must show that "(1) the city's . . . training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality; and (3) an alleged deficiency in the city's training procedures actually caused the plaintiff's injury." *Andrews*, 98 F.3d at 1076 (internal citations and quotation marks omitted). "[A] claim for failure to supervise requires the same analysis as a claim for failure to train." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013) (internal quotation marks omitted). "Neither claim can succeed without evidence the municipality "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." *Id*. at 1216-17 (quoting *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010)). *See also S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." ) (quotation marks omitted).

As to the first element, the City has submitted evidence of LaHay's extensive training, and Plaintiff identifies no deficiencies in the training LaHay received. As to the second element, as discussed above, there is no evidence of a pattern of similar constitutional violations that might demonstrate deliberate indifference to the need for additional training.

25

In her brief, Plaintiff points to LaHay's testimony about his training or supervision of his subordinate officers and suggests that it was inadequate. *See* Pl.'s Mem., ECF No. 51, at 5-7.[10] However, the alleged constitutional violation was committed by *LaHay himself*, not any of his subordinate officers. Even if LaHay inadequately trained, supervised, or disciplined his subordinate officers in some way, such deficiencies could not have "actually caused the plaintiff's injury" in this case.

In sum, Plaintiff has not presented sufficient evidence to support a finding in her favor on a municipal liability claim, and the City is entitled to summary judgment on Count II.

### C.     State Law Claims (Count III)

Because the Court is granting summary judgment in favor of Defendants on both federal claims, the Court must now determine whether it will exercise supplemental jurisdiction over the remaining state law claims in Count III. A district court may decline to exercise supplemental jurisdiction over state claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray*

---

[10] For example, Plaintiff suggests that LaHay allowed his officers to work even though they had not complied with required training, that he did not know whether there was a procedure for disciplining City officers under the departmental orders, that he did not participate in the discipline of subordinate officers and simply waited to be told about it, and that he could not speak to what his officers knew about departmental policies.

*Cty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  This reflects the policy that the federal courts should "exercise judicial restraint and avoid state law issues whenever possible" and should "provide great deference and comity to state court forums to decide issues involving state law questions." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). *See also Gregoire v. Class*, 236 F.3d 413, 419-20 (8th Cir. 2000) ("When state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity.") (quotation marks omitted).

After consideration of the relevant factors, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims, which solely involve questions of state law that would be better determined by the Missouri state courts. Accordingly, Plaintiff's remaining state law claims (Count III) will be dismissed without prejudice. To the extent that Defendants' motions for summary judgment are directed to Count III, they are denied as moot.

### D.    Motion to Strike

Defendants move to strike from the record a document titled "Brief Background and Relevant Facts," ECF No. 50, filed by Plaintiff in opposition to Defendants' motions for summary judgment. Defendants argue that this is an unauthorized, extraneous filing and would impose an unfair burden on Defendants. Plaintiff did not file a response.

A review of this document shows that its text is, aside from its title, identical to Plaintiff's memorandum in opposition to LaHay's motion for summary judgment (ECF No. 51-1), filed the same day. Although the Court finds no potential prejudice to Defendants from the filing of this memorandum, the Court will strike it because it is extraneous and entirely duplicative of another document filed in the case. The exhibits attached to ECF No. 50 are not duplicative and will remain

in the record.

### E. Motions to Exclude Expert Testimony

Defendants move to exclude the testimony of Plaintiff's expert, Christian Stephenson, arguing that he lacks expertise in police shooting cases and that his opinions are improper and incorrect legal conclusions.[11] Plaintiff moves to exclude the testimony of Defendants' expert, Steven Ijames, arguing that his opinions are improper legal conclusions, invade the province of the jury, are unhelpful to the jury, and are irrelevant.

The resolution of these motions to exclude is unnecessary to the Court's ruling on Defendants' motions for summary judgment. Defendants do not rely on any evidence from their expert (Mr. Ijames) in seeking summary judgment, and Plaintiff does not rely on any evidence from her expert (Mr. Stephenson) in opposing summary judgment. Although Defendants cite facts from Plaintiff's expert in support of their motions,[12] the Court did not rely on those facts in granting Defendants' motions, and the Court's rulings would be the same with or without consideration of those facts. Because Defendants are entitled to summary judgment on Plaintiff's federal claims regardless of whether the expert opinions are admitted or excluded, and because the Court is declining to exercise jurisdiction over the state law claims, the Court finds the motions are moot and will deny them without prejudice.

---

[11] Plaintiff did not file any opposition to Defendants' motion. Additionally, in responding to a statement of fact offered by Defendants that describes Stephenson's testimony, Plaintiff states, "Admit sentence two, but object to the propriety of same, as Defendants have moved to exclude said expert and Plaintiff has filed no objection to same." ECF No. 50-1, at ¶ 26.

[12] Defendants cite Plaintiff's expert's evidence in support of two statements: (1) that peer-reviewed empirical data suggests that, on average, it takes an officer 1.5 seconds to react to action taken by a suspect, ECF No. 39, ¶ 20, and (2) that Plaintiff's expert has no criticism of the Bismarck Police Department's Use of Force policy, *id.* at ¶ 26.

28

## IV.  CONCLUSION

For all of the above reasons,

**IT IS HEREBY ORDERED** that LaHay's Motion for Summary Judgment [ECF No. 40] is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 (Count I) and **DENIED** as moot as to Plaintiff's claims under state law (Count III).

**IT IS FURTHER ORDERED** that the City's Motion for Summary Judgment [ECF No. 37] is **GRANTED** as to Plaintiff's claims under 42 U.S.C. § 1983 (Count II) and **DENIED** as moot as to Plaintiff's claims under state law (Count III).

**IT IS FURTHER ORDERED** that Plaintiff's claims under 42 U.S.C. § 1983 (Counts I and II) are **DISMISSED**, with prejudice.

**IT IS FURTHER ORDERED** that Count III is **DISMISSED**, without prejudice, for lack of subject matter jurisdiction.

**IT IS FURTHER ORDERED** that Defendants' motion to strike a memorandum filed by Plaintiff in opposition to summary judgment [ECF No. 60] is **GRANTED**. ECF No. 50 shall be **STRICKEN** from the record. ECF Nos. 50-1 through 50-8 shall remain in the record.

**IT IS FURTHER ORDERED** that Defendants' motion to exclude the opinions of Plaintiff's expert [ECF No. 43] is **DENIED** as moot.

**IT IS FINALLY ORDERED** that Plaintiff's motion to exclude the opinions of Defendants' expert [ECF No. 45] is **DENIED** as moot.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of May, 2026.

29